```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
```

------------------------------X **Docket#**
COOK,                         : 15-cv-06559-ILG-CLP
              Plaintiffs,     :
                              :
     - versus -               : U.S. Courthouse
                              : Central Islip, New York
                              :
CITY OF NEW YORK, et al.,     : October 14, 2016
              Defendants      :
------------------------------X

```
        TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
           BEFORE THE HONORABLE CHERYL L. POLLAK
              UNITED STATES MAGISTRATE JUDGE
```

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Plaintiff**:          **Ryan Michael Lozar, Esq.**
                              The Law Office of
                              Ryan Lozar
                              305 Broadway, 10th Floor
                              New York, NY 10007


**For the Defendant**:          **John L. Garcia, Esq.**
                              **Genevieve Nelson, Esq.**
                              New York City Law Department
                              100 Church Street
                              New York, NY 10007



**Transcription Service**:      **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1            THE CLERK:  This is the matter of Cook v. City

2    of New York, case number 15-cv-6559, Civil Cause for Oral

3    Argument.

4            Counsel, please state your appearances for the

5    record.

6            MR. LOZAR:  Good morning.

7            It's Ryan Lozar for plaintiffs Darlene Cook and

8    Shaqueena Cook.

9            THE COURT:  Good morning.

10           MR. GARCIA:  Good morning, your Honor.

11           John Garcia on behalf of the defendants.

12           MS. NELSON:  And Genevieve Nelson also on

13    behalf of the defendants.

14           Good morning.

15           THE COURT:  Good morning.  You may be seated.

16           All right.  So, I've received your papers on

17    connection with the plaintiff's motion to amend the

18    complaint.  Maybe since it's your motion, you want to go

19    first?

20           MR. LOZAR:  Oh, yes, your Honor.  Thank you.

21    Do you prefer that --

22           THE COURT:  You can sit because it's actually

23    better --

24           MR. LOZAR:  Oh, for the recording.

25           THE COURT:  -- for the recording, yeah.

3

Proceedings

1          MR. LOZAR:  Okay.  Thank you.

2          Your Honor, so we're here today as you

3   mentioned on the motion to amend.  This motion to amend,

4   it adds to defendants to the complaint.  Those defendants

5   -- their names are ACS child protective specialist

6   Sarissa Wright (ph.) and ACS child protective specialist

7   supervisor Sasha Dawson (ph.).  And Ms. Dawson is Ms.

8   Wright's supervisor for the purposes of all the

9   allegations that we're discussing today.

10         These two individuals came in -- they've

11   actually been discussed in the context of this case for

12   quite some time between the parties' counsel, as well as

13   with the Court.  This started out as a pure false arrest

14   action that was brought by Ms. Cook, Darlene Cook and as

15   we were exploring this, she was arrested in the context

16   of ACS' and NYPD's emergency removal of children from

17   this home at 97-28 Kings Highway.

18         And as we've discussed -- and as we started to

19   discuss the facts, the underpinning Darlene Cook's

20   claims, it soon became very clear that the ACS matter was

21   part and parcel of our study.  And by that I mean that an

22   OGA offense, you can only obstruct governmental

23   administration and perfect so to speak, a criminal

24   offense under that New York Penal Law if there actually

25   is an official function that's being performed at that

4

Proceedings

1    moment.

2          And so, in making inquiry about what sort of

3    official function ACS was actually performing in that

4    moment, I got in touch with Shaqueena Cook and as your

5    Honor knows from being present for this part, Shaqueena

6    Cook, she also became a plaintiff in this case by virtue

7    of that inquiry.

8          Now when Shaqueena Cook, she came into the

9    case, you know, even still the subject was under study as

10   to what sort of official function was ACS executing that

11   day and in order to fully understand that because

12   obviously Ms. Cook's -- Shaqueena Cook's -- I'm just

13   going to say their full names to not be confusing --

14   Shaqueena Cook's impression was that there was no

15   emergency circumstance that would have justified the

16   children's removal from 97-28 Kings Highway that day.

17         And so, the parties are put in the position

18   where we needed to see the ACS records to better

19   understand this beyond Shaqueena Cook's opinion and on

20   the eve of the June 6th conference with the Court -- I

21   don't know if I got the date exactly right but it was an

22   early June conference with the Court, the day before I

23   received nine or ten pages of ACS records and I read from

24   excerpts of those ACS records to the Court during that

25   conference and it seemed very much to me that they only

5

Proceedings

1     added further questions as to what sort of emergency

2     circumstances existed on that day.

3          And so, in light of that fact, the Court

4     ordered the production of additional ACS records to shed

5     even more light on the subject, as well as family court

6     records, so that we could review those nine single pages

7     which to my view actually seemed very bad for the

8     defendants.  So, we have a fairer picture of everything.

9          And in that same conference, I discussed with

10    the Court and with my adversary that for the time being

11    pending the production of those records, I wasn't going

12    to make any motion to bring in the ACS defendants because

13    I wanted any amendment to that effect to be brought in

14    good faith.  And so, I wanted a greater universe of

15    knowledge of information before I made that motion.

16          And so, the thing that we're here today is that

17    it is that motion.  It's the product of the productions

18    that came in the aftermath of that conference.

19          To be honest, as the Court have it, you know,

20    all the records that have been produced to date from ACS,

21    we still haven't gotten any family court records but all

22    the records that have been produced from ACS to date,

23    they really don't do -- I mean really, like the nine

24    pages are something that like, you know, are of primary

25    interest to me because all of the rest of the production

6

Proceedings

1   that's happened since then, it's -- they're kind of

2   bookends but doesn't explain the nine confusing pages

3   very well.

4           In any event, so, you know, what we hoped might

5   edify us further actually kind of just leaves us with

6   like the nine pages which I think makes a really good

7   claim for Darlene and Shaqueena Cook both.

8           And so where does that leave us?  So, I make

9   this motion to amend the complaint which with respect to

10  the NYPD defendants, it really doesn't alter the equation

11  very much.  The NYPD defendants, you know, leafing

12  through the pleading, we could talk about it with

13  specificity if your Honor would like, it will all sound

14  very familiar to you.

15          The only thing is that the ACS defendants are

16  rotated in on some of these claims.  Things that are new

17  in terms of claims, there's a due process claim that

18  Shaqueena Cook is bringing against the ACS defendants

19  that is not a claim that belongs to Darlene Cook.

20  Shaqueena Cook, she is bringing that against the ACS

21  defendants for -- there's ample case law and in thinking

22  about this claim, you know, there's like this triumvirate

23  of Second Circuit cases, Sutherland, Tannenbaum and

24  Wilkinson (ph.), that talk about when emergency

25  circumstances exist and the various things that are

7

Proceedings

1    required for a claim under this like this, too to lie.

2             But here, basically the damages that Shaqueena

3    Cook would seek under this due process claim, they would

4    cover a relatively brief period of time, a matter of days

5    and I say that because eventually there was a post-

6    deprivation hearing and it's my understanding from the

7    case law that once that post-deprivation hearing occurs,

8    the -- any damages that stem from the emergency

9    circumstances, removal, is cut off.  So, that's really

10   like the brief block of time that we're talking about and

11   that's why the family court records are very important

12   because I don't really know what happened on that day.

13            I've done like a parallel pursuit with Mr.

14   Garcia for family court records from Shaqueena Cook's

15   counsel, and we could talk about that later, but both of

16   our efforts to date have not yielded the family court

17   records and that's --

18            Another --

19            THE COURT:  What --

20            MR. LOZAR:  Sorry.

21            THE COURT:  -- what was it that you did to try

22   to get the family court records?

23            MR. LOZAR:  So, I wrote to Shaqueena Cook's

24   family court attorney and he contacted me and said he

25   needed a consent form.  I obtained the consent form from

8

Proceedings

1   Shaqueena Cook.  I sent it to him.  He contacted me again

2   and said, "Actually there are no records," and I said,

3   "How could that be?  Because this is a case that's been

4   going on for a very long time."

5         He -- well, in sum and substance he said that I

6   don't know how to litigate discovery matters and that I

7   should make a motion with the Court to get it from the

8   government.  And so, it was little bit of like

9   strangeness because I don't know why he asked me to

10  execute the consent in the first place and I've

11  considered what sort of relief I might seek from the

12  Court to compel him to produce them but -- anyway, in

13  brief, that's the story, so far.

14        THE COURT:  So -- okay.  And --

15        MR. LOZAR:  And I understand that --

16        THE COURT:  But you made a request to

17  defendant's counsel, as well?  Is that what I heard you

18  say?

19        MR. LOZAR:  Yes, and so -- actually, I think it

20  was the date of the conference because I mean, the June

21  conference when I was with -- when we were with the Court

22  before, the Cooks were actually here, although you might

23  remember they arrived moments too late to actually be

24  with us at the conference.  I spoke with Shaqueena Cook

25  that day, she executed a release.  She came to my office

9

Proceedings

1  and executed the release.  And so since June, that

2  release has been with defendants and that's a pending

3  matter, an appointment for me to go and look at the

4  records which -- it's not a matter of like setting the

5  appointment.  I don't think the records are there yet.

6          THE COURT:  Okay.  Well, let me just clarify

7  that point and then we'll go back to your argument

8  because this is a discovery issue that I would like to,

9  you know -- I mean, obviously these records are

10  important.  We should get them.

11          So, did you receive the release or consent or

12  whatever it is he sent and where are we in the process of

13  getting family court records?

14          MR. GARCIA:  So, your Honor, we have received

15  the release from plaintiff for the record.  We've made

16  multiple requests to the family court for the records.

17  We have not receive them yet.  We have even tried to go

18  through the ACS's legal department for the records and to

19  no avail.  We still do not have the records.

20          THE COURT:  Okay.  So, somebody bring me a

21  subpoena, okay, along with the release and I'll so-order

22  it.  I mean, we can't -- how long ago did you make the

23  request?

24          MR. GARCIA:  I think our latest request was in

25  August, your Honor and we will take care of the subpoena

10

Proceedings

1   to get these records.

2           THE COURT:  Okay.  I appreciate that.  So, if

3   you will get me a subpoena.  All right.  So, that takes

4   care of that.  We're going to get these records, one way

5   or the others because I agree with you that they may be

6   relevant for both sides.

7           MR. GARCIA:  Right.

8           THE COURT:  You know, we have to know what

9   happened.  Okay.  So, go ahead.  I'm sorry.

10          MR. LOZAR:  okay.

11          THE COURT:  You were talking about the new

12  claim, due process violation brought against ACS by

13  Shaqueena.

14          MR. LOZAR:  Yes.

15          THE COURT:  What else?

16          MR. LOZAR:  And so -- should we move on from

17  that claim and talk about the other -- I mean, I could

18  discuss that more if you have any questions.

19          The unlawful search claim is added.  That is a

20  new claim that is against the ACS defendants alone.  And

21  that is only brought by Darlene Cook.  That claim is

22  founded on the fact that (one), the emergency removal was

23  effected at 97 -- not 97-28 Kings.  The NYPD and possibly

24  ACS defendants but certainly NYPD went into 97-28 Kings

25  over Darlene Cook's objection to effect the emergency

Proceedings

1   removal of the children.

2          And the plaintiffs -- Darlene Cook's argument

3   with respect to that claim is that the Fourth Amendment

4   does bind all government agencies -- case law, it does

5   recognize that certain agencies might have special needs

6   exception.  There is no general special needs exception

7   for ACS.  Certain circumstances might merit unique

8   considerations about how the Fourth Amendment binds them

9   in certain contexts but here Darlene Cook's argument is

10  that no such special needs existed because there were no

11  exigent circumstances in the first place.

12          THE COURT:  So, the illegal search is the

13  search for the children?  Is that what we're talking

14  about?

15          MR. LOZAR:  Well, actually I should say

16  unlawful entry rather than unlawful search.  I should say

17  that.

18          THE COURT:  Okay.  That makes more sense to me.

19          MR. LOZAR:  And it has been established through

20  discovery.  Your Honor may remember that very early on we

21  talked about the fact that this is a shelter -- well,

22  it's a -- it's one of these like apartments in the

23  Department of Homeless Services where -- it's an

24  apartment that someone lives in.  It's a private

25  apartment that is managed by the Department of Homeless

Proceedings

1    Services and so there was some question as to whether or

2    not she signed away her constitutional rights or some

3    modification of them by virtue of being there.  There

4    have been DHS records produced.  I've gone through them

5    all.  And to my view, there's nothing to that effect.

6            THE COURT:  So, your argument on the lawful

7    entry is that the ACS workers who were there to take the

8    children had no right to enter the apartment.

9            MR. LOZAR:  Right, for the --

10           THE COURT:  Right?  That's the idea?

11           MR. LOZAR:  Exactly.  So, the fact that they

12   had no justification to actually seize the children, they

13   had no right to enter the apartment to seize the

14   children.

15           THE COURT:  I see.

16           MR. LOZAR:  But they both constituted -- well,

17   the seizure of the children, that's a Fourth Amendment

18   violation of the children's, from what I -- that's how

19   understand the law, whereas the -- whereas that affected

20   due process violation for Shaqueena Cook, right -- the

21   separation of the family is the due process issue for

22   Shaqueena Cook.  It's a violation of the children's

23   Fourth Amendment rights.

24           THE COURT:  Okay.

25           MR. LOZAR:  But with respect to the entry into

13

Proceedings

1  Darlene Cook's apartment, that is a violation of Darlene

2  Cook's Fourth Amendment rights.  That's what we're

3  alleging.

4          THE COURT:  Okay.  And the children are not

5  suing in this case, right?

6          MR. LOZAR:  They are not, no.

7          THE COURT:  Okay.  Go ahead.

8          MR. LOZAR:  Let's see.  And so, you know,

9  that's -- those are the most substantive things that have

10  been added -- you know, I will discuss though I mean, the

11  pre-existing false arrest claim, you know, those things

12  have become somewhat more complicated here.  It's only --

13  it's somewhat more complicated and we've talked about

14  this I think in the phone conference that sort of teed up

15  this motion to amend, that is there some sort of conflict

16  here between the NYPD and the ACS defendants.

17          So, since we all had that conversation

18  together, I took great pains when I crafted the complaint

19  and hopefully it's clear in the fact section which is

20  paragraphs 15 through 50, that I understood that the NYPD

21  defendants in some respects here sounds an awful lot like

22  these warrant situations, right, where -- so ACS

23  defendants represents to the NYPD defendants that there

24  is in fact emergency circumstances -- there are, in fact,

25  emergency circumstances to remove these children and so,

14

Proceedings

1    you know, the NYPD defendants, like they have no other

2    reason to believe otherwise, right?

3            And so, I guess the question becomes, you know,

4    well, why then are they here at all?  And the plaintiff's

5    answer to that is the way this originally looked, even

6    without the ACS defendants is the plaintiffs don't think

7    that they did anything that would -- even if there was a

8    legitimate official function, even supposing there were

9    emergency circumstances, that what happened there that

10   day did not constitute the kind of physical interference

11   that the penal law -- New York Penal Law contemplates in

12   the elements of GA.  And so, that is why the NYPD

13   defendants are still here.

14           THE COURT:  Okay.  All right.  Well, let me

15   hear from defendants and then depending on what they say,

16   I may come back with more questions for you.

17           MR. LOZAR:  Okay.

18           THE COURT:  So, go ahead.

19           MR. GARCIA:  Yes, your Honor.  Good morning and

20   may it please the Court, the Court should deny the

21   plaintiff's motion for leave to amend for two reasons.

22   First, plaintiff's amendments are prejudicial and second,

23   plaintiff's proposed new claims are not bible, thereby

24   making any amendment futile.  First, plaintiff's

25   amendments are prejudicial to not only the existing NYPD

15

Proceedings

1  defendants, Office Gomez and Sergeant Liesengang, but

2  also to the proposed ACS defendants, Ms. Wright and Ms.

3  Dawson.

4            These ACS employees will be prejudiced because

5  they will take time away from ensuring the well-being of

6  children under the City's care to defend against futile

7  claims.

8            Plaintiff's motion comes at a time when the

9  media and the public have vilified ACS has an

10  organization for their inaction which led to the death of

11  Zymere Perkins and recently, ACS Commission Gladys

12  Carrion said that cases should never slip through the

13  cracks.  Zymere Perkins tragic death was a case that

14  slipped through the cracks.

15            But here, we have a case that easily could have

16  but did not slip through the cracks.  These ACS employees

17  were proactive.  They intervened to make sure that

18  Shaqueena Cook's children were safe and now they're being

19  sued for doing their jobs.

20            As for the NYPD defendants, this case -- and

21  plaintiff agrees, this case began with Darlene Cook's

22  false arrest claim against Officer Gomez.  Plaintiff's

23  proposed amendments threatened to make this case more

24  confusing and as plaintiff admits, more complicated,

25  unnecessarily so.  The plaintiff's proposed amendments

16

Proceedings

1  concerning the ECS employees, have little bearing on the

2  false arrest claim.  The NYPD defendants arrested

3  plaintiffs based on their observations at the scene.  And

4  Officer Gomez and Sergeant Liesengang are entitled to be

5  judged by the evidence as they knew it.

6          That does not include the more than 300 pages

7  of Shaqueena Cook's ACS records.  Without these proposed

8  records against ACS, those records are not relevant.

9  Plaintiffs are trying to bolster their false arrest

10 claims by blending the actions of ACS and NYPD.

11         Plaintiff's attempt to expand this case will

12 result in prejudice to the NYPD defendants because they

13 will be judged not for their actions but for the decision

14 of ACS to remove Shaqueena Cook's children.  This

15 prejudice can be avoided if plaintiffs bring a separate

16 action rather than an amendment.

17         Second, plaintiff's new claims are not viable.

18 The plaintiffs are seeking to add five claims, your

19 Honor.

20         THE COURT:  Well, let me just go back for a

21 second on that last point, okay?  Your argument is that

22 the NYPD officers who acted based upon information

23 provided by ACS will be prejudiced if this is tried as

24 one lawsuit, is that what I am understanding you to say?

25         Aren't what you really saying is what the

Proceedings

1   plaintiff has said which is maybe this presents a

2   conflict in the sense that you, as corporation counsel,

3   are going to be in a difficult position defending the

4   NYPD who are going to say well, we acted on their say so

5   and, you know, therefore we're innocent of all these

6   charges that you've brought against us and yet at the

7   same time, have to defend the ACS workers?

8           I mean, do we have  a situation where we need

9   to bring them all in and make sure that they want to

10  continue to be represented by you, given the potential

11  conflict that I see here?

12          MR. GARCIA:  Well, your Honor, that may be the

13  case if these amendments are allowed to go through.

14  That's another reason why the cases should perhaps be

15  separate and plaintiff originally said that the NYPD's

16  equation doesn't change very much but as you pointed out,

17  that's not true.  There is a prejudicial effect to the

18  NYPD defendants if the ACS defendants are brought in as

19  well.

20          MS. NELSON:  Your Honor, I believe on the

21  proposed amended complaint, rather than a conflict

22  between the ACS workers and NYPD, it's more likely that

23  plaintiff's false arrest claim cannot stand against the

24  NYPD defendants.  If it is, by his own admission, that

25  they relied on information by the ACS workers, as they

18

Proceedings

1   should have.  They had a right to.  If that's the case,

2   then there was probable cause to make the arrest and so,

3   it seems that's where the conflict is.  It's with whether

4   or not the claims that plaintiff is trying to make can

5   survive.

6           THE COURT:  Well, I mean I think that's sort of

7   a different question.  That's a motion --

8           MS. NELSON:  But --

9           THE COURT:  -- a different motion than the one

10  that's before me today.

11          MS. NELSON:  I agree.

12          THE COURT:  I was just sort of responding to

13  counsel's argument that --

14          MS. NELSON:  Right.

15          THE COURT:  -- the better road here would be to

16  have two separate lawsuits, basically addressing the same

17  facts which I am a little troubled by but --

18          MS. NELSON:  Yes, I --

19          THE COURT:  -- I understand your point.

20          MS. NELSON:  And I agree, your Honor.

21          THE COURT:  That may be an argument later for

22  summary judgment or --

23          MS. NELSON:  Or --

24          THE COURT:  -- a motion to dismiss or whatever,

25  but I --

19

Proceedings

1          MS. NELSON:  May I address part of your

2    concern, your Honor, and I think that Mr. Garcia by the

3    time he gets to the end of his presentation, might answer

4    some of your Honor's questions but I believe there is

5    some mischaracterization of the information that is in

6    the ACS records which would lead anyone to believe, based

7    on plaintiff's motion, that the ACS workers did not have

8    the right to an emergency removal.

9          If you remove that equation and you really

10   understand the records, I don't see that there's a

11   conflict.  There was a need for an emergency removal.

12   NYPD was called for assistance.  When the plaintiffs

13   denied access, however we want to describe denying

14   access, then they were arrested accordingly for OGA, so I

15   think as Mr. Garcia continues, some of your Honor's

16   questions might be answered.  If not, we're happy to

17   address it further.

18          THE COURT:  Okay.  But I think you would have

19   to agree with me that there's a disputed issue of fact

20   here on that the plaintiff is taking the position that

21   there was no emergency reason to remove the children and

22   you're saying that the ACS workers, in fact, did have a

23   reason to remove the children and therefore, their

24   actions were supported, as were the officers who relied

25   on their actions.

Proceedings

1          But that again, I think we're sort of getting

2   beyond what we have here which is a motion to amend.  But

3   maybe you're right.

4               MS. NELSON:  But -- right.

5               THE COURT:  Maybe as Mr. Garcia goes forward

6   and continues his argument, I'll --

7               MS. NELSON:  Right.

8               THE COURT:  -- understand better your position.

9               MS. NELSON:  And it seems more, your Honor --

10   and just two brief points.  It seems your Honor, more

11   that what is being created are issues of fact rather than

12   conflicts amongst the defendants but your Honor, if it

13   will appease your concern, one of the things that we can

14   do in our office is talk to all of the defendants and

15   make sure that they understand any potential concerns

16   your Honor might have and --

17               THE COURT:  Yeah, I haven't done this for --

18               MS. NELSON:  -- formally --

19               THE COURT:  -- I haven't done this for a while.

20               MS. NELSON:  -- formally consent to multiple

21   representation.

22               THE COURT:  But this is the --

23               MS. NELSON:  Exactly.

24               THE COURT:  -- Dutton proceeding that --

25               MS. NELSON:  Exactly.

21

Proceedings

1          THE COURT:  -- you know, we've done in other

2    cases --

3          MS. NELSON:  Right, and --

4          THE COURT:  -- where usually it's officers who

5    have different positions but --

6          MS. NELSON:  I completely understand.

7          THE COURT:  We'll address that after the issue

8    of the amendment is decided.  If there's no amendment,

9    there's no conflict.  If there's an amendment, there

10   might be a need for a Dutton hearing, so --

11         MS. NELSON:  Understood.

12         THE COURT:  Okay.  So, I'm sorry.  Go ahead,

13   Mr. Garcia.

14         MR. GARCIA:  As I was saying, the plaintiffs

15   were seeking to add five claims:  failure to intervene

16   against the ACS defendants, fabrication of evidence

17   against both NYPD and ACS defendants, false arrests

18   against the ACS defendants, an unlawful entry claim

19   against the ACS defendants and substantive due process

20   against the ACS defendants.

21         With respect to the new failure to intervene

22   claim, there can be no such claim against the ACS

23   defendants.  Only law enforcement officers have a duty to

24   intercede and prevent constitutional violations.  The ACS

25   defendants here are not law enforcement officials and

Proceedings

1    have no duty to intervene and prevent plaintiff's arrest.

2    Thus, this new intervene -- failure to intervene claim

3    fails as a matter of law.

4              Next, the proposed fabrication of evidence

5    claim also fails against both NYPD defendants and the ACS

6    defendants.  To state a claim for fabrication of

7    evidence, plaintiffs must show five elements.  One, an

8    investigating official fabricated evidence that is likely

9    to influence a jury's decision, forwarded that

10   information to prosecutor and the plaintiff's suffered a

11   deprivation of liberty as a result.

12             First, plaintiffs now allege that the ACS

13   defendants forwarded fabricated evidence to the DA's

14   Office.  In fact, the only person who communicated with

15   the District Attorney's Office was Officer Gomez.  And

16   even if the ACS employees could be liable for Officer

17   Gomez's actions, this claim fails for the same reasons

18   that it does against Officer Gomez because the alleged

19   fabricated evidence is statements by ACS which would be

20   inadmissible hearsay and would never influence a jury's

21   decision.

22             Likewise, Officer Gomez's statements to the

23   District Attorney's Office are also inadmissible hearsay.

24   Plaintiffs do not allege that the NYPD coerced the

25   confession or planted evidence.  Instead, their claim

Proceedings

1  rests solely on Officer Gomez's statements to the

2  District Attorney's Office.  Those statements are

3  inadmissible and would never reach a jury and cannot be

4  the basis for a fabrication of evidence claim.

5       With respect to the new false arrest claim

6  against the ACS defendants, plaintiffs are attempting to

7  impute personal involvement on the ACS defendants.  A

8  person cannot be liable for the false arrest of another

9  unless she instigates or procures that person's arrest.

10  Meaning that she fabricated a criminal accusation and

11  induced the police to rely on that accusation.

12       Here, the ACS defendants did not invent a

13  criminal accusation to tell the police.  They merely

14  requested NYPD assistance to conduct the emergency

15  removal which is not the same thing as accusing the

16  plaintiffs of committing a crime.

17       Moreover, plaintiff's arrest were based on the

18  observations of the officers on the scene, as opposed to

19  any statements ACS defendants made.  Therefore, the ACS

20  defendants did not induce plaintiff's arrest and the

21  proposed false arrest claim is not viable.

22       Darlene Cook's proposed unlawful entry claim

23  also fails.  Now, your Honor, this is the third pleading

24  and Darlene Cook has never alleged that anyone entered

25  her apartment, not the NYPD, not ACS.  Instead, the

24

Proceedings

1   plaintiff's only allege that the NYPD entered the

2   vestibule, an area in which no one has an expectation of

3   privacy because it's a common area.

4           Now, to the extent that plaintiffs now allege

5   that there was an entry, the entry was made with the

6   consent of the nonparty occupants who were inside the

7   home who opened the door after the plaintiffs were

8   arrested.

9           THE COURT:  Okay.  So, describe the scene to me

10  here.  This is a multi-family home.

11          MR. GARCIA:  Your Honor, this is Darlene Cook's

12  apartment.

13          THE COURT:  Okay.  So, ti's a multi --

14          MR. GARCIA:  She had --

15          THE COURT:  -- family building?

16          MR. GARCIA:  yes, your Honor.

17          THE COURT:  Okay.  And on what floor does she

18  live?

19          MR. GARCIA:  I believe it was the first floor.

20          THE COURT:  Okay.  And so, the officers knocked

21  on the door from the outside and entered the -- what

22  you've described as the vestibule.  It's like a hallway

23  that is -- leads to multiple apartments or just her

24  apartment?

25          MR. GARCIA:  I'm not sure -- quite sure, your

25

Proceedings

1 Honor, but I believe that -- actually, your Honor, I am

2 not sure because -- on the facts before I --

3          MR. LOZAR:  I could shed some light on that.  I

4 mean, obviously the defendants are able to dispute this

5 later if something else comes up, but from what I

6 understand, this all starts on the sidewalk and I think

7 it is a multi-apartment building but this is a single

8 family apartment and it has an entrance directly from the

9 sidewalk.

10          And so, this vestibule that we're talking

11 about, the way it's been described to me by my clients is

12 that it's something akin to if you -- the sort of place

13 where I, you know -- you would put like umbrella -- you

14 like walk in, like a coat -- I don't know if there were

15 coat hooks -- this is how, you know -- umbrellas, and

16 then the next door goes in.

17          And so, that's -- I can answer more questions

18 but that's my general -- that's the very brief

19 description of what I know.

20          THE COURT:  Is this the kind of an entryway

21 where obviously you would go through another door to get

22 into the plaintiff's living room or dining room or foyer

23 or something, right?  Is that what you're saying?

24          MR. LOZAR:  Um.

25          THE COURT:  You enter into this area where you

Proceedings

1    say coats and umbrellas would be stored and then there's

2    yet another locked door into the actual living space of

3    the apartment?

4             MR. LOZAR:  Yes, yes.  After the second door.

5    So, there's the first sidewalk door, let's say.  And then

6    there's the second door.  Beyond the second door is the

7    living room.

8             THE COURT:  Okay.

9             MR. LOZAR:  And I gather it's locked because it

10   seems from, you know, all accounts that the police

11   couldn't just go in.  They could not open the door, but

12   -- but, yes.

13            THE COURT:  And is there a staircase in this

14   coat area that leads to the second floor?

15            MR. LOZAR:  No.  But it's my understanding that

16   this is just -- it just goes directly to -- there's no

17   other doors.  There's stairs.  It's just --

18            THE COURT:  Just into Darlene Cook's apartment?

19            MR. LOZAR:  Yes, that's my understanding.

20            THE COURT:  All right.  I just want to get a

21   sense -- go ahead.

22            MR. GARCIA:  Yes, your Honor.  And as I was

23   saying, the police made entry after the plaintiffs were

24   arrested because the occupants who were still inside the

25   apartment, opened the door for the police.

Proceedings

1        Lastly, with respect to the substantive due

2   process claim, plaintiff's allegations in the proposed

3   second amended complaint, misstate and mischaracterize

4   the record.  The Second Circuit has held that an

5   emergency removal of children may be conducted when there

6   is a risk that the child will be left bereft of care and

7   supervision.

8        Now plaintiffs would have this Court believe

9   that there was no such emergency.  Their allegations make

10  it seem as if three ACS workers saw the child and

11  concluded the situation was okay.

12       Now these allegations in the proper context

13  however show that plaintiffs do not have a viable claim.

14  Now, I don't think there is a dispute of fact as to the

15  16 pages of the pertinent ACS records, your Honor.  Those

16  were -- I think the facts contained in those records are

17  not in dispute.  It's simply that plaintiffs are

18  misquoting and misstating the records to make it appear

19  as if there's no emergency.

20       For example, paragraph 26 of the proposed

21  second amended complaint misquotes the ACS records.

22  Plaintiffs quote in that paragraph is from Darlene Cook's

23  prior history which refers to the birth of Shaqueena

24  Cook's daughter, not the birth of her son.

25       Paragraph 29 misstate CPS worker Dawson's

28

Proceedings

1    opinion of the case.  She did not say in her records that

2    the children were not in imminent danger.  In fact, one

3    of her hypothesis in this case -- would your Honor like a

4    copy of the records?

5            THE COURT:  Have they been provided to me in

6    connection with the motion?

7            MR. GARCIA:  Yes, your Honor.  They were filed

8    as Plaintiff's Exhibit D.

9            THE COURT:  Okay.  That's fine.  I don't need a

10   copy of it but I just want to make sure that it's part of

11   the record before me.

12           MR. GARCIA:  Yes, your Honor.  And Ms. Dawson's

13   hypothesis can be found on Bates stamp number DEF-0048.

14   One of her hypothesis was that the mother is unstable to

15   care for her two young children and does not have any

16   provisions for the children.  The mother does not have a

17   support system.

18           This does not reflect upon the plaintiff's

19   allegation that everything was okay.  And then in

20   paragraph 30, your Honor, they cherry-pick the most

21   favorable portions of a home visit and ignore the dire

22   reality that the children were facing.  There was an

23   imminent risk to the children's well-being in this case

24   because after giving birth to her son, Shaqueena Cook had

25   no source of income and was in an unstable living

Proceedings

1   situation.  She told the ACS employees that she did not

2   have enough provisions for her children.  She only had

3   the limited supplies the hospital gave her which was four

4   bottles of formula and a few Pampers.  This for both her

5   newborn and her infant daughter.

6          And so, the ACS defendants promptly concluded

7   that there was a threat upon the children and that they

8   needed to be proactive.  And so when I said earlier that

9   this was a case that could have slipped through the

10  cracks, that's exemplified from plaintiff's allegations

11  that if you look at it from plaintiff's point of view,

12  this case could have slipped through the cracks.  But

13  upon closer review of the records, your Honor, you'll see

14  that there was the conditions for emergency removal and

15  the ACS workers had to act.

16         And so plaintiffs do not have a viable

17  substantive due process claim and for the foregoing

18  reasons, the Court should deny plaintiff's motion to

19  amend.

20         THE COURT:  Was this decision to remove the

21  child done in conjunction with the family court or was

22  this something that the workers determined on their own

23  to do?

24         MR. GARCIA:  Your Honor, this was a decision

25  made internally within ACS.  That is why it was an

30

Proceedings

1  emergency removal.  They also sought a petition from the

2  family court as they were simultaneously conducting the

3  emergency removal but they felt they had to move in now

4  before seeking a court order.

5       THE COURT:  And --

6       MR. GARCIA:  Which they have the right to do

7  under the New York State Social Services and Family Court

8  Act.

9       THE COURT:  Right, I know, but you are probably

10  too young to remember this but I am sure your co-counsel

11  does, not to suggest that you're -- but I am sure you

12  recall the Nicholson case in which Judge Weinstein issued

13  a variety of rulings regarding emergency removals and

14  separation of children were there was -- there were

15  issues.  And so, having worked on that case for more

16  years than I want to think about, I'm very sensitive to

17  the concerns of when children can properly be removed and

18  so the fact that the mother doesn't have a job is

19  obviously of concern but, you know, there are a lot of

20  young women who have just given birth who don't have

21  jobs, I dare say.  And in this instance, it seemed as

22  though she was with family members.

23       So, I don't know -- you know, I guess my

24  question is what's going on here raising a Nicholson

25  issue?

31

Proceedings

1          MS. NELSON:  Your Honor, I don't believe it is

2    and it's been a while since I dealt with Nicholson but I

3    don't believe you can look at just the fact that she did

4    not have a job as dispositive of this issue.

5          I think the ACS workers looked at the totality

6    of the circumstances.  They had all this information from

7    -- information they gathered, information that Shaqueena

8    Cook told them and I believe they had the right to take

9    that seriously, whether or not it turns out that she did

10   have a support system, they have the right to rely on

11   what she says to make a determination as to whether or

12   not the children should be removed immediately because of

13   the circumstances.

14         And, Mr. Garcia can speak to -- your Honor,

15   rather than misstating this, may I just have a minute

16   with Mr. Garcia?

17         THE COURT:  Absolutely.

18   (Counsel confer)

19         MR. GARCIA:  So, yes, your Honor, even though

20   as you mentioned, Ms. Cook was with some family members

21   at the time, the family as a whole did not have enough

22   resources for their -- for all the children, as well,

23   that were in the household at the time.

24         Ms. Cook specifically only had the limited

25   supplies that the hospital gave her and as I said,

32

Proceedings

1   Shaqueena Cook only had the supplies for her children and

2   the situation she was in was an unstable one.  She was

3   not in the same apartment as Darlene Cook.  Remember, she

4   had her own separate unit that she was sharing with some

5   family members, which I believe was also Department of

6   Homeland Services Housing and I think they were even

7   being evicted or in the process of being evicted.  I'm

8   not quite sure on that.

9          But that's why ACS felt there was an unstable

10  living situation.  The family members, as a whole, did

11  not have enough provisions for all of the children in the

12  household and Shaqueena Cook specifically told her --

13  told the ACS workers that she did not have enough

14  provisions for her children.

15         THE COURT:  Okay.  So, I interrupted your

16  argument.  I don't know if there were any other points

17  that you wanted to make at this time before I turn it

18  back to plaintiff to respond to anything he wants to

19  respond to.  Are you done?

20         MR. GARCIA:  Yes, your Honor.

21         THE COURT:  Okay.

22         MR. GARCIA:  That's it.

23         THE COURT:  All right.  Great.

24         Counsel, is there anything you would like to

25  respond to?  Do you have a position on -- I don't know if

33

Proceedings

1  you're familiar with Nicholson or not but the issue that

2  I am talking about which is --

3          MR. LOZAR:  Well -- excuse me.  So, I think

4  that -- I haven't read Nicholson.  I think that probably

5  I read some of the cases that Nicholson decided.  Your

6  Honor was alluding to these Second Circuit cases before

7  but, you know it is impression from this conversation

8  that it's our position that an issue fact exists as to

9  this.  There are some very positive reports during those

10 nine pages that are in this period where the emergency

11 circumstances were found to exist.

12         And, you know, again I don't think it's

13 plaintiff's burden to prove that like this was a Leave It

14 To Beaver household.  I think that the emergency

15 circumstances questioned its -- you know, at that moment,

16 there was a reasonable time -- there was a reasonable

17 period of time consistent, unlike now, like where's like

18 a quote -- but anyway, a reasonable time consistent with

19 the safety of the child to obtain a judicial order and if

20 there was, the emergency removal was unwarranted.  And I

21 think that this is --

22         THE COURT:  Well, did your client tell ACS that

23 she didn't have enough provisions to feed her children?

24         MR. LOZAR:  Well, I will say two things about

25 that.  Number one, I think that she said -- I forget what

34

Proceedings

1   the exact language is, you know, I don't have to read it

2   into the record but it's something to that effect, right,

3   you know, that's -- I have these -- this number of

4   bottles of milk, right?  I'm not quite sure exactly like

5   how it was posed.

6          But I will also mention that the Social

7   Services Law that -- these representatives who come to

8   the house, they frequently assist families in obtaining

9   supplies for (indiscernible).  And that's actually part

10  of the story.

11         I mean, Ms. Wright and Shaqueena Cook had this

12  experience with ACS in the past.  She said, I'm going to

13  come and bring you some diapers and so, in talking to

14  these people, you know, in a way, describing what your

15  needs are is a way to have your needs met.  And I think

16  that that is a large part of what is happening here.

17         THE COURT:  So, you think what was going on was

18  she telling them can you bring me some additional formula

19  and diapers and things of that sort, that that's why she

20  was saying I'm running out.

21         MR. LOZAR:  That is what I think.  I mean,

22  further discovery will shed some light on that.  She was

23  living with her sister at the time.  You know, the fact

24  that she has a -- when she invited Ms. Wright to come to

25  deliver the diapers, you know, this is because the

Proceedings

1  matriarch of the family had died the previous day and she

2  said, you know, I am going to be with the family at 97-20

3  and there are like 15 to 20 family members there and, you

4  know, whether or not those people would be able to

5  support her in some material way with diapers or milk, I

6  don't know but it's not a situation that like so clearly

7  is the emergency that -- the way that, you know

8  -- it can only be spun as an emergency --

9          THE COURT:  Okay.

10          MR. LOZAR:  -- is my best position.

11          THE COURT:  Do you have any other arguments

12  that you would like to address that defendant's counsel

13  raised on the various claims that you seek to add?  I

14  don't know if there's anything that he said that you

15  wanted to respond to directly?

16          MR. LOZAR:  Well, you know, I will say -- you

17  know, I don't want to just say things to, you know, to

18  defense by myself but, I mean, if you have particular

19  questions I am happy to answer them.

20          I do think it's an interesting question about

21  -- so the fabrication of evidence, for instance, like

22  that's something that I thought about or the false arrest

23  for that matter.  And the fact that the ACS defendants

24  are being brought in or requesting to be brought in,

25  particularly like the word forwarding, right, in the

36

Proceedings

1   context of the fabrication of evidence.  It is certainly

2   true that, you know, at some point there is one person

3   who hit the fax button send and so, I thought about, you

4   know, what does the word forwarding mean?  Does it mean

5   that only one individual can ever be liable for a

6   violation of fabrication of evidence?

7           And I  don't think that that's true.  I think

8   that's, you know, Sergeant Liesengang for one example, I

9   think there's some dispute about that as well.  He was

10  the supervisor on the scene.  He actually is like signing

11  off on all the reports, knowing full-well that they are

12  going to be sent to the District Attorney's Office and

13  that this is going --

14          Anyhow, I think that like the way that these

15  words are interpreted they are interpreted in a way that

16  does like encompass someone beyond a person who pushes

17  the fax button.

18          With respect to the ACS defendants, the way I

19  am looking at this is that from the starting premise,

20  that there -- they could not have reasonably thought that

21  these were emergency circumstances.  That's our starting

22  premise, right?

23          And yes, they did not actually arrest the Cooks

24  and yes, they did not actually push the fax button but I

25  think that they knowing -- it's our position that there

37

Proceedings

1    were no emergency circumstances, they invoked the police

2    power and like come with us, right?  And so there is this

3    agency on the part of these ACS defendants that brings

4    them into the purview of these constitutional violations.

5            Yes, I think that -- and obviously, we're doing

6    the Section 1983 actions and so, you know, this is under

7    color of state law, right?  And so it's not the instance

8    of like a private party communicating false statements to

9    the police.

10           Actually, it's a very interesting area of the

11   law.  I mean, it's -- of all things, I thought that if

12   the Court were to ask for supplemental briefing, this is

13   something that, you know, is not totally obvious, right.

14   And there is lots of case law out there that I've seen

15   that's, you know, of interest in this respect.

16           THE COURT:  All right.  Well, I will take all

17   of this under advisement, review the briefs in light of

18   the arguments today and I will issue an order shortly.

19   Okay?  Thank you very much.

20           MS. NELSON:  Thank you, your Honor.

21           MR. GARCIA:  Thank you, your Honor.

22               (Matter concluded)

23                  -o0o-

24

25

Transcriptions Plus II, Inc.

38

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **10th** day of **November**, 2016.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.